## JACQUES HANDLINE *v.* THE STATE.

1. CONSTITUTIONAL LAW — LOCAL OR SPECIAL LAWS. — The act of May, 1876, which provides for five terms of the District Court of Bexar County, is not a "local or special law," within the meaning of the constitutional inhibition of such enactments, unless previous publication of notice respecting them be made.

2. SPECIAL VENIRE. — The transcript shows no separate entry respecting the drawing of the names of the persons summoned on a special *venire*, but the writ itself recites that they had been selected in the manner provided by law, and nothing to the contrary is shown by the record. *Held*, that the presumption obtains that the requirements of the jury law were observed.

3. CONTINUANCE. — The fact that a *capias pro fine* had been awarded against a defaulting witness does not exonerate a defendant from suing out new

process for him. See the opinion for the diligence necessary in applications for a second continuance.

4. MURDER — EVIDENCE. — A State's witness, who had testified that he had seen the accused and the deceased travelling together a day or two before the homicide, was asked by the State if the accused recognized him in the jail. *Held*, a pertinent and proper question with respect to the identification of the accused by the witness.

5. SAME. — Acts and conduct of a defendant in arrest, either before or after being accused of the crime, may be proved as circumstances indicative of a guilty mind, — as, for instance, the deportment of the accused when confronted with the corpse of the deceased.

6. IMPEACHMENT of a witness is a matter regulated by well-established rules, which do not sanction purposeless inquisition into the antecedents of witnesses.

APPEAL from the District Court of Bexar. Tried below before the Hon. G. H. NOONAN.

In April, 1878, the grand jury of Bexar County presented an indictment against Jacques Handline, the appellant, for the murder of Peter Maddox, with an axe, on the 24th of the preceding February.

On Tuesday, the 26th of February, 1878, the corpse of an old man was found in the San Antonio River, within the corporate limits of the city of San Antonio. The head had been crushed in by some blunt instrument. Not being immediately identified, it was taken to the poor-house and buried. A day or two afterwards it was exhumed, and fully identified as the corpse of Peter Maddox, a man of advanced age. The nature of the wound upon the head, and the place at which the body was found, could leave no doubt that he had been murdered.

No eye-witness of the crime was to be found, and the case made by the prosecution was one of circumstantial evidence, elicited from many witnesses, whose testimony consists of many details. No circumstance tended to inculpate any one but Handline, and all together convinced the jury that he was the assassin, and their verdict was murder in the first degree.

Z. Van Ward, the first witness for the State, testified that
he knew Handline, the defendant, and saw him in company
with the deceased the Sunday evening preceding the murder.
They were near witness's place, about three miles north of
San Antonio, on the Fredericksburg Road. The deceased
had some conversation with witness, and the defendant
stood a few steps off, but within hearing distance. Maddox
asked witness if he had seen a man and woman in a wagon,
and a black horse tied behind the wagon; and witness
informed him that such a party was camped over in the
hollow, about three hundred yards off. Maddox then
remarked to the defendant, "That is Patterson's camp."
Witness left the defendant and the deceased together. The
next morning he went into San Antonio, and, about nine
or ten o'clock, found the defendant on the market plaza
with a wagon loaded with buffalo-meat, and buffalo-hides
thrown over the meat. It was a small, old-fashioned wagon,
with two oxen hitched to it. Witness asked the defendent
where old man Maddox was; and he replied that he did not
know, but supposed he was around somewhere. Defendant
asked witness if he did not want to buy some of the buffalo-
meat. Witness went home, and returned to town the next
morning and made inquiries for Mr. Maddox, but could
learn nothing of him; and, meeting with Mr. Patterson, he
specially inquired of him, because he understood that Pat-
terson had travelled with the deceased and the defendant.
The next day, which was Wednesday, witness again went
to town, and inquired of Patterson if he had yet found Mr.
Maddox. After seeing the defendant on the market plaza
on Monday morning, witness saw him no more until he saw
him in jail, on Wednesday or Thursday. Witness recog-
nized him, and he recognized witness, and came up and
shook hands with him. Maddox, the deceased, was an old
man, about five feet seven or eight inches high, and wore
a soldier's blue blouse, with brass buttons. He seemed to
be in a dilapidated condition. Witness never saw him but

the one time, when he was with the defendant near witness's place, as already stated.

· William Patterson, for the State, testified that he became acquainted with both the defendant and the deceased at Concho, Texas, in December, 1877, or January, 1878, where they had a load of country produce, and seemed to be partners in trade. Afterwards they had a load of buffalo-meat, in which, as the defendant told witness, he and the deceased were partners. They left Concho together, coming to San Antonio. At Fort McKavett, some fifty miles from Concho, witness saw the defendant, who said that the deceased was on behind with the wagon. Witness saw neither of them again until he reached the head of Johnson's Creek, about twenty miles from McKavett, where he found them camped together, with a wagon hauled by a yoke of oxen, and loaded with buffalo-meat, covered with buffalo-hides. A spare ox was tied behind the wagon, which was an old-fashioned, long-hubbed, wooden-axletree wagon, with wedges between the tires and the felloes. From Johnson's Creek on, the party consisted of the defendant, the deceased, two men named Walker and Compton, witness and his wife, until they reached the Leon Spring, which is about eighteen miles from San Antonio, and where, leaving the defendant and the deceased still in camp on Saturday morning, the rest of the party drove on. Witness drove on Saturday to about a quarter of a mile of Z. Van Ward's residence, and camped there that night and the next day and night. While there, neither the defendant nor the deceased came to his camp. Monday morning, witness drove to the outskirts of San Antonio, and camped on the San Pedro Creek, at a spot between two roads, where he felt sure he would see the deceased and the defendant when they should come along. He stayed there all day Monday, but saw nothing of them. On Tuesday morning, leaving his wife in camp, he came into town to seek them, and on the military (frequently called the market),

plaza found their wagon and team.  He looked around for
Mr. Maddox, but could see nothing of him.  He found the
defendant, however, sitting in a store door on the west side
of the plaza; bade him good morning, and asked him where
Mr. Maddox was.  The defendant leaned forward in his
chair, looked around as if to see Maddox, and replied,
"Why, he is right around here somewhere."  Witness
told him he wanted to see the old man, and requested
him to tell Mr. Maddox, as soon as he returned, that he
(witness) had been there looking for him.  Witness told
defendant where his camp was, and requested him to tell
Mr. Maddox to come up there.  This was about nine or
ten o'clock Tuesday morning.  Witness, after leaving the
defendant, went to a store door at a corner of the plaza,
and there took a seat to watch for Mr. Maddox; but, seeing
nothing of him after staying fifteen or twenty minutes,
returned to his camp.  Witness came to town the next day,
and again looked for Maddox, but saw neither him nor
the defendant.  The next morning, which was Thursday,
he resumed his search, and at Stumberg's wagon-yard he
found the spare ox belonging to Maddox.  Leaving there,
he met Capt. John Dobbin, the city marshal, and, giving
him a description of Maddox, inquired if he had seen any
thing of him.  Upon information obtained from Capt. Dob-
bin, witness accompanied him to the office of Judge Cotton,
a justice of the peace, and there made an affidavit for a
warrant against the defendant.  Capt. Dobbin and two
of his policemen went in search of the defendant.  Witness
and Capt. Dobbin went together, while the two policemen
were sent to Stumberg's wagon-yard; and, after looking
around awhile, witness and Capt. Dobbin also went there,
and saw the defendant driving down the street in that
direction.  He was arrested by the police and taken to
Judge Cotton's office, where he was turned over to Mr.
Bader, the constable.  Carriages were obtained, and witness
and others, taking the defendant along, went to the poor-

house to see the remains of a man who had been buried there on the preceding Tuesday. The coffin was taken up, and when the lid was raised, the witness at once recognized the remains as those of old Mr. Maddox, and exclaimed, "That is old Peter Maddox; poor old fellow, he is dead; I am so sorry;" and then, turning to the defendant, said, "Jake, you killed him; you can't deny it." Defendant hung his head, but did not seem much abashed.

The witness mentioned various articles of bedding and some implements which he had seen in the camp of the deceased and the defendant, on their route from Concho. Among the latter he described a small chopping-axe, with which, at the camp on the Guadalupe River, he had himself cut some prickly-pears for Mr. Maddox's oxen. It had a home-made handle, and the back was battered. An axe was then exhibited to the witness, and he identified it as the same axe. He could not state what was the value of the load of buffalo-meat. Between Fort McKavett and the head of Johnson's Creek there is a distance of some twenty miles where no one lives. So far as witness knew, the defendant and the deceased, on their way to San Antonio, travelled this part of the road without company.

H. Potchiusky, for the State, testified that, as he and another boy were going home one morning, about eight or nine o'clock, he saw a dead man in the San Antonio River, about seventy-five or one hundred yards below the lower iron bridge. Witness first thought the body was a log, and threw a stone at it, when it turned around, and he saw it was a man. He saw the ears, and observed that the brains were coming out of the head. He remained there while the other boy went to give information about it, and after awhile Judge Cotton and some police came, and dragged the body out of the river. The testimony of the other witnesses shows that this was on Tuesday, February 26, 1878.

Fred Bader, for the State, testified that he was a constable, and aided in taking the body out of the river. The

head had been crushed in with some blunt or heavy instrument, making a wound in which the witness laid two of his fingers. There was no other wound on the deceased, and no indications of decomposition. Witness had the body taken to the poor-house and buried. A day or two afterwards witness first saw the defendant, when he was turned over to witness by the police, at Judge Cotton's office, and took him to the poor-house, along with Capt. Dobbin, William Patterson, and others, to ascertain if the man taken from the river and buried at the poor-house was Peter Maddox. The remains, when disinterred, were recognized by Patterson and two others as those of Maddox. Witness could not say how long the remains had been in the river.

Capt. John Dobbin, for the State, testified that he was the city marshal of San Antonio, and arrested the defendant on the 28th of February, 1878, by virtue of a warrant issued by Judge Cotton, on an affidavit made by William Patterson. His account of the arrest was substantially the same as Patterson's. He stated that when the remains buried at the poor-house were exhumed, the defendant showed no emotion until the corpse was raised to a sitting posture, when he dropped his head, closed his mouth firmly, and gave three heavy gulps, or swallows, as if choking. The defendant, when witness arrested him, had a wagon and a yoke of oxen. In the wagon there was buffalo-meat and hides, and in the wagon-yard some old quilts and a small axe. Witness could not be positive that the axe exhibited in court was the same, but it looked like it. There were dry spots of blood on the quilts. On the axe there was a dark-colored substance. It was taken to Judge Cotton's office. There was no blood on the defendant's clothes, nor on the wagon.

Dr. G. H. Kalteyer, for the State, testified that he was a druggist and chemist, and, with other medical gentlemen, went to the poor-house and examined the corpse identified as that of Peter Maddox. The axe in court was delivered

by Judge Cotton to the witness, who had kept it ever since. It was taken to the poor-house, and the back of it fitted to the wound on the skull of the deceased. From where witness was standing, a little distance off, it appeared to fit the wound well. The axe was delivered to witness that he might make a microscopical and chemical examination for blood; which he carefully and critically did, and on the back of it found blood. But, the blood having dried, it was not possible, with the means accessible to him, to ascertain whether the blood was that of a human being or of some other species of the mammalia. The blood corpuscles of the ox, buffalo, sheep, dog, and other animals, are almost identical with those of the human family. Those of human beings are a very little the largest. The blood on the axe was that of some species of the mammalia, and this was all he could state as to its nature. The axe itself, witness was confident, had been washed after the blood had gotten on it. Iron will sometimes retain blood crystals and spots for years. Witness also found dry blood-stains on some bedding and quilts delivered to him by Judge Cotton. He ascertained them, also, to be the blood of the mammalia. The blood on the quilts was comparatively fresh, but witness could not say whether it had been on them a week or a month.

E. Dietrich, for the State, testified that in February, 1878, he was keeping a restaurant, next door to Stumberg's wagon-yard. Between seven and eight o'clock in the morning of the Tuesday before the defendant was arrested, he came to witness's restaurant and got his breakfast. About ten o'clock of the preceding night witness was in Stumberg's wagon-yard, looking for poultry and such country produce as he needed. The defendant's wagon was not there then. About five o'clock the next morning witness was in the wagon-yard again, and saw the defendant's wagon, with three steers standing near it. The wagon was loaded with buffalo-meat, and hides thrown over the meat.

Witness could not say at what hour of the night the defendant went into the yard, but it was between ten o'clock, P. M., of Monday, and five o'clock, A. M., of Tuesday. No person came with defendant to breakfast Tuesday morning, nor did witness see any one with him or about his wagon in the wagon-yard. Witness again saw the defendant about noon on the succeeding Wednesday, peddling buffalo-meat on the plaza. There was no white man with him.

Walter Cox, for the State, testified that, late one Monday evening in the latter part of February, 1878, he saw the defendant on the east side of the San Antonio River, a quarter of a mile or more below the lower iron bridge. It was between sunset and dark. The defendant had a yoke of oxen, and an old-fashioned wagon loaded with buffalo-meat, and hides on top. Defendant was not camped, but had stopped there ; and he asked witness if he would be allowed to make a fire, and witness told him there would be no objection to his doing so. Defendant then said he had buffalo-meat for sale, and asked witness if he wanted any at eight cents per pound, and gave witness a small sample of the meat, which he drew out with his hand from under the buffalo-hides. No person was with the defendant. The next morning witness was again where the defendant had stopped, but found that he had left there, and had made no fire. Defendant was in jail when next seen by witness, who was requested by the officers to go there and see if he could find the man he had seen on Monday evening with the load of buffalo-meat. Witness recognized the defendant, both by his dress and his personal appearance, from among ten or fifteen prisoners. Witness also saw the wagon again, and recognized it.

The foregoing is by no means all of the testimony adduced by the State, and is greatly abbreviated from the details narrated by the witnesses. The defence introduced six witnesses to the reputation of the defendant. Some of these had known him as long as two years, and all con-

curred in ascribing to him a very good reputation for integrity and peaceable deportment.

The jury found the defendant guilty of murder in the first degree; his motion for a new trial was overruled; judgment of death was rendered against him, and he gave notice of appeal. The opinion of this court discloses the matters relied upon for a reversal of the judgment. The record manifests that a vigorous and able defence was made in the court below by the counsel who represent the appellant in this court.

*Mason & Paschal*, for the appellant, ably discussed the various errors assigned.

*Thomas Ball*, Assistant Attorney-General, for the State.

Ector, P. J. The defendant in this case was indicted in the District Court of Bexar County, for the murder of Peter Maddox. The indictment was presented by the grand jury on the third day of April, 1878. The case was tried at the following December term of said court, and the defendant was convicted of murder in the first degree. The points presented for determination are all embraced in the several bills of exception.

The defendant filed a plea to the jurisdiction of the court, and suggested that it had no authority to hear and try this cause, " because an act entitled ' An act prescribing the times of holding the District Courts of the Twenty-second Judicial District,' approved May 30th, 1876, by which said act the county of Bexar is given five terms of the District Court, is unconstitutional, null, and void, said act being a special act, and therefore in direct violation of the terms and meaning of art. 5, sect. 7, of the Constitution."

The District Court overruled the plea to the jurisdiction, and, we think, in this no error was committed. The act in question is not in violation of the Constitution. It is a gen-

eral, and not a special act. *Cordova* v. *The State, ante,* p. 207.

Defendant filed a motion to quash the special *venire,* which was properly overruled. The record shows that, on the first day of the term of the court at which this case was tried, the court, on motion of the county attorney, ordered " a special *venire facias* for sixty jurors to issue forthwith, for the trial of this cause, returnable into court on or before the 10th day of December ; and that this cause be set for trial on the 12th day of December, A. D. 1878." On the following day (which was the second day of the term), the clerk of the District Court of Bexar County issued a writ of special *venire facias* for sixty jurors, to serve as special jurors in this cause, giving their names, which was delivered to the sheriff of said county. The writ of special *venire facias* states that the persons named therein have been selected, in the manner provided by law; to serve as special jurors in this case, and the return on said writ by the sheriff is as follows : " Came to hand Dec. 3rd, 1878, and I caused this *venire* to be executed by summoning the within-named persons ; a list of the names is hereunto attached, and made a part of this return ; said parties were served either in person or by written notice, and I delivered a true copy of the list of the persons summoned to the defendant, this Dec. 9th, A. D. 1878." Then follows the list of those summoned, including forty-seven of the sixty persons named in the original writ of special *venire facias.* While the record does not in so many words state that the clerk first drew the said *venire,* and then issued the said writ, or that said *venire* was drawn by the clerk in the presence of the judge, in open court, the writ of special *venire facias* states that the persons whose names are set out therein were selected in the manner provided by law; and, in the absence of any thing to the contrary, we must presume that the rules prescribed in sect. 23 of our jury law were in all things observed. See Gen. Laws 1876, pp. 82, 83, chap. 76, sect. 23.

Defendant was only entitled to a copy of the list of those summoned on the special *venire;* and this was done. He had no legal right to be in court when the *venire* was drawn. We deem it unnecessary to discuss the other questions raised in the motion to quash.

We are of opinion that the court below did not err in overruling defendant's motion for continuance. His application states " that he has absent the following material witnesses : Albert Rhodes and Argyle Rhodes, both residents of Tom Green County, Texas ; that the defendant has used due diligence to procure the attendance of said witnesses, as follows : that he had issued out of this honorable court a writ of attachment for the said Albert and Argyle Rhodes, on the 9th day of April, A. D. 1878, which said writ, issued as aforesaid, was directed to the sheriff of Tom Green County, Texas ; which said attachment was returned by said sheriff on the 9th day of May, A. D. 1878, executed on May 4th, 1878, by attaching said Albert and Argyle Rhodes, and taking their bonds for appearance to this court, which said bonds are here on file, and made a part of this motion ; that, at the June term, 1878, of this honorable court, on the 19th day of said month of June, this cause was called for trial, whereupon came defendant, and showed to the court that he could not safely proceed to trial, owing to the absence of said Argyle and Albert Rhodes, and other witnesses, and made a motion to continue this cause, which motion is on file, and is hereby referred to ; and it appearing to the court that said witnesses were material for the defence, this cause was thereupon continued, and it was ordered by the court that the said Albert and Argyle Rhodes be each fined the sum of one hundred dollars, and that a *capais pro fine* issue forthwith for the same ; but, notwitstanding said order of the court, this defendant is informed and verily believes that said *capias pro fine* has not been issued, and that if the said *capias pro fine* had been issued and executed in conformity with the orders of this court, this defendant be-

lieves that the said witnesses would have been present at the trial to-day, as he is informed and verily believes that, at the time of the said order of the court, the said Albert and Argyle Rhodes were then, and ever since have been, residents of the said county of Tom Green. Wherefore the defendant shows to the court that great and irreparable injury would be done him from failure to carry out the said order, heretofore made by this honorable court; that, it appearing that said Albert and Argyle Rhodes were each under bond of one hundred dollars for their appearance from day to day and term to term of this court, which bonds are on file, and hereto referred to, this defendant did not cause any subsequent attachment to issue for the said Albert and Argyle Rhodes, as he relied upon and considered the above stated order of court and their said bonds sufficient to bring them into court. Defendant says, further, he has absent the following material witnesses: Fred Schroeder and Joseph Lang; that he has used due diligence to procure their attendance, as follows: that he had issued, on the 9th of April, 1878, an attachment out of this court, directed to sheriff of Tom Green Co., Texas; that the attachment was filed in this court on 9th May, 1878, with the following return: ' Came to hand April 10th, 1878, and Fred Schroeder and Joseph Lang not found in this county.

[Signed]                              'A. McALVAINE,

                              ' Sheriff of Tom Green Co.,

                              ' By R. W. THOMAS, Deputy.'

" Notwithstanding said return, this defendant was at the time, and has ever since been informed and believes, and here alleges, that the said two above-named witnesses were, at the time of said return, and have been ever since, and are still, residents and citizens of Tom Green County, Texas. Wherefore defendant, subsequently, to wit, on the 27th day of May, 1878, had issued an *alias* attachment out of this court, directed to the sheriff of Tom Green County, Texas, for the said Fred Schroeder and Joseph Lang; that said

attachment was placed in a sealed envelop, and stamped with a three-cent United States postage-stamp; that it was directed as aforesaid, and mailed on same day that it was issued, by this defendant's attorney, Geo. Paschal; that, this last-named attachment not being returned on the 19th day of June, A. D. 1878, when this cause was called for trial, it was ordered by the court that a fine of one hundred dollars be entered against the said sheriff of Tom Green County, Texas, for failure to return the same; yet, notwithstanding said fine, the said sheriff has not up to this day returned said *alias capias*, but has wholly failed and neglected so to do, and this defendant is informed and verily believes that there has been an omission to enter said fine upon the records of this court, and that if said fine had been entered in conformity with orders of this court, this defendant believes said *alias capias* would have been returned as the law provides. That subsequently, to wit, on the 30th day of November, 1878, defendant had issued another attachment out of this honorable court, directed to said sheriff of Tom Green County, for said Fred Schroeder and Joseph Lang; that said attachment was placed in a sealed envelop, and stamped with a three-cent United States postage-stamp; that it was directed as aforesaid, and mailed on the same day it was issued, by this defendant's attorney, J. R. Mason; that the last-named attachment has not, up to this time, been returned. That the above-named witnesses are material to the defence in this case," etc.   *   *   *

We have copied so much of the defendant's application for continuance because, in our estimation, it is the most material question presented in all the bills of exception.

We believe that the motion fails to show the diligence on the part of a defendant to procure the attendance of his witnesses, which is requisite on a second application for continuance. This application shows no diligence as to the witnesses Albert and Argyle Rhodes; after their failure to appear at the June term of the court, no further process

was applied for or issued for them.    Issuance of process for collecting a fine is not the means provided by statute to be used on the part of the defendant to secure the attendance of his witnesses at his trial.    And as to the witnesses Schroeder and Lang, the defendant should have applied for *alias* attachments for them, returnable to the next term of the court.    Instead of doing this, he allowed both the June and October terms to pass, and did not apply for *alias* attachments for them until just two days before the term of the court began at which he was tried, and gives no sufficient reason for not doing so sooner.    Before a second application for continuance is granted, it should show that the party applying has been guilty of no laches or neglect.    We cannot say that the District Court erred in overruling the defendant's application for continuance.

The defendant and deceased left Concho together, as is shown by the statement of facts, with a load of dried buffalo-meat, in an old wagon drawn by a yoke of oxen, for the city of San Antonio.    The buffalo-meat belonged to them in partnership ; the wagon and oxen were claimed by the deceased.    During the trial of the cause, the following question was propounded to Z. Van Ward, one of the State's witnesses, by the county attorney, upon his direct examination, to wit :  "Did the defendant recognize you in jail?"  To which defendant objected, on the ground that defendant was then under arrest ; which objection the court overruled, and permitted the witness to testify as follows, to wit :  "He did."    To which ruling the defendant excepted, and took a bill of exceptions.    This evidence was to identify the accused.

The witness Ward was the last person, so far as the record discloses, who saw Peter Maddox alive ; he was then in company with defendant, late on Sunday evening, near the residence of the witness, about three miles from the city of San Antonio.    Defendant was next seen in San Antonio on the following Monday, and also on Tuesday, with said wagon

and oxen, offering to sell the buffalo-meat. Maddox was not with him; and on being asked, on Tuesday, where old man Maddox was, he replied, "Why, he is right around somewhere." On the same morning the dead body of an old man was seen in the lower part of the city of San Antonio, in the San Antonio River, about eighty yards below the lower iron bridge across the river. The skull had been crushed by a severe blow on the fore part of the head with some dull, heavy instrument. There were no other marks of violence on the body. The dead body was carried to the poor-house and buried. On the next day it was disinterred, and identified as the body of Peter Maddox by several persons who knew the old man when alive. The defendant, in charge of an officer, was carried along at the time.

On the trial, John Dobbin, one of the State's witnesses, proceeded to testify, upon his direct examination, as follows, to wit: "I placed the prisoner at the foot of the coffin." The defendant here asked the court to instruct the witness not to state any thing the prisoner said or did, or how he acted, he then being under arrest. The court, however, permitted the witness to testify as to what the defendant did, and how he acted, by permitting the witness to testify as follows, to wit: "He showed scarcely any emotion whatever until the body was raised, by my order, and placed in a sitting position; he then looked down, and acted as if he was swallowing with his mouth shut." The witness was permitted to testify as to the acts, only, of the defendant. A bill of exceptions was taken to this ruling of the court.

While the confession of a defendant while under arrest shall not, as a general rule, be used against him, the conduct of the party, either before or after being charged with the offence, as indicative of a guilty mind, is proper to be laid before the jury; and Mr. Roscoe says this is a very useful kind of evidence, and one which no judge need seek to withdraw from the consideration of a jury. Roscoe's Cr. Ev. 18, 19.

The objections urged in the sixth, seventh, eighth, and ninth bills of exception were not well taken. The identification of the axe and bedding, and the connection of the accused with them, were, we believe, sufficiently established. The court did not err in overruling defendant's motion for a new trial. Most of the questions therein presented have been passed upon in this opinion.

When the State's witness William Patterson was on the stand, and after the witness had, in the opinion of the court, stated fully enough for all practical purposes, — his residence and citizenship of many years in the State of Texas, and his present occupation, — counsel for the defence propounded to him other questions, touching his former occupation and different places of residence, stating that, as the witness was a comparative stranger in San Antonio, and as it was important for the jury to know some thing of the character of the person who was testifying, the questions were asked to show that the witness had led a wandering, unsettled, and adventurous life, going from State to State, never staying long in one place, and had been engaged in questionable transactions. Counsel for the State objected to any further question being propounded to the witness touching his former occupation and different places of residence, as irrelevant in this case. The court sustained the objections, and, we think, properly, for the reasons given by the court.

To have allowed any further inquiry of the kind would have resulted in the trial of the witness. To investigate the antecedents of a witness, without some purpose, would be a digression that would consume the time of the court for no useful purpose, and would lead to the wildest vagaries. The manner of impeaching the testimony of a witness is regulated by well-established rules of evidence, and it is obvious that the course of examination attempted cannot, and ought not, be adopted.

The charge of the court was a fair and able one, and covered all the points in the case. All the charges asked

were given.   The evidence shows that the wound on the head of the deceased produced his death ; that it was neither self-inflicted nor accidental, but was given by another, and was not the result of a momentary passionate impulse, but was the act of premeditation and cool deliberation.

The dependency of human life on this decision has compelled our attention to the case in its minutest points.   We have found nothing in the record that would authorize us to reverse the judgment of the District Court, and it is, therefore, affirmed.

*Affirmed.*